**GRADMANN & HOLLER GmbH et al., Plaintiffs,**

v.

**CONTINENTAL LINES, S.A. et al., Defendants.**

**GRADMANN & HOLLER GmbH et al., Plaintiffs,**

v.

**OAK STEAMSHIP CO., LTD. et al., Defendants.**

Civ. Nos. 78–664, 78–1403.

United States District Court, Puerto Rico.

Aug. 28, 1980.

---

Jose F. Sarraga, Old San Juan, P. R., for plaintiffs.

Jose Antonio Fuste, Jimenez & Fuste, Hato Rey, P. R., for defendants.

## MEMORANDUM, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

GRANT, Senior District Judge.

These consolidated cases were tried before the court without a jury commencing on March 26, 1980. On the 2nd of April, the court heard oral arguments, following which the parties filed and exchanged written memoranda together with proposed findings of fact and conclusions of law, and the matter was submitted by the parties for decision.

Civil No. 78–664 is an action for damages filed by Gradmann & Holler GmbH; and Eidgenossische/Versicherungs-AG, in subrogation, and Thyssen Steel Caribbean, Inc. Civil No. 78–1403 is a similar action for damages filed by the same plaintiffs, plus one additional plaintiff: Caribe Steel and Tube Corporation (Caribe Steel), the purchaser of the allegedly damaged goods for which claims are made.

The first case (No. 78–664) is brought against the owners and operators of the Motor Vessel MAR TIRRENO (hereinafter the "Mar Tirreno"), which was owned by Compania Maritima del Nervion, S.A., a Spanish corporation headquartered in Bilbao, Spain, and which at all relevant times had been time-chartered to Continental Lines/Contramar, S.A., a Belgian corporation also doing business as a common carrier by water. At all material times the master and crew of the Mar Tirreno were in the employ of the owner, Maritima del Nervion, S.A.

The second case (No. 78–1403) is brought against the time charterers and agents of the Vessel SS Madonna (hereinafter "the Madonna") which was time-chartered to Tokai Shipping Company, Ltd. It was admitted and the court finds that at all times relevant hereto the defendant Oak Steamship Company, Ltd., was an agent acting on behalf of the defendant Tokai Shipping Company, Ltd. The owner of the Madonna was not brought in as a party to this action.

This court has jurisdiction pursuant to 28 U.S.C. § 1333, since these are admiralty and maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

The court received testimony from various witnesses, including three employees of Thyssen Steel Caribbean, Inc., and/or Caribe Steel. These witnesses were presented by the defendants to support their contention that plaintiffs did not have a right or cause of action which could be validly enforced against the defendants.

The court received some testimony in Spanish through the official interpreter of the court. Insofar as that testimony is concerned, we make a specific finding that the same was received without the court's having any doubt as to the correctness of

the translations made. At all times said testimony was understandable. *Santana v. United States of America*, 572 F.2d 331 (1st Cir. 1977).

In making the factual determinations which follow, the court has considered the conflicts and inconsistencies in the evidence. The findings to be made herein are based not only on the evidence as received, but also on the evidence which appeared most credible to the court, taking into consideration the interest of the parties, the interest of the witnesses, and the demeanor of the same.

These consolidated actions, brought under the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq., (the Act), are actions for damages to two cargos of galvanized wire, one transported from Antwerp, Belgium, (the Mar Tirreno case), and one from Osaka, Japan, (the Madonna case)—each to San Juan, Puerto Rico. Each case seeks recovery for payments made under an open marine cargo insurance policy issued to Thyssen Steel of Canada, Ltd., (the parent corporation), by Gradmann & Holler's Marine Insurance Department in Hamburg, acting as agent for the Swiss firm, Eidgenossische/Versicherungs-AG, the leading underwriter in the case. It will be noted here that the Certificate of Insurance covering the Mar Tirreno cargo was dated October 20, 1975, that being one day before the Mar Tirreno arrived in San Juan, Puerto Rico. The certificate of insurance involving the Madonna case was dated July 2, 1976, although the vessel had sailed from Osaka, Japan, on June 13, 1976. The date of the Madonna's arrival in San Juan was disputed in the evidence.

Caribe Steel of Catano, Puerto Rico, (a co-plaintiff in only the Madonna case), placed purchase orders for galvanized wire from Thyssen Steel Caribbean, Inc. That commercial agreement was under a "C.I.F. basis, San Juan, Puerto Rico" under the terms of which title to the goods passed to the buyer at the point of shipment (either in Antwerp, Belgium, or Osaka, Japan) and the seller had the obligation of providing specific insurance for the benefit of the buyer to cover the costs of marine transportation.[1] The seller did not procure such independent specific insurance for the benefit of its buyer but, instead, made claim against its own insurance carrier under the open marine policy which covered all shipments of cargo made by Thyssen Steel Caribbean, Inc.

In each of these cases defendants raised as an affirmative defense that the plaintiffs are not the real party in interest, that they are not the party who, by the substantive law, has the right sought to be enforced and, thus, are not entitled to bring the present actions. They further contend that any claim of the buyer of the steel, Caribe Steel (in the Madonna case) is barred by the applicable statute of limitations.

In the Mar Tirreno case, plaintiffs' contentions are based upon allegations that the vessel encountered heavy weather while crossing the Atlantic and that sea water entered into the No. 2 starboard side lower hold, creating a condition of rust on the cargo, out of which this claim arose. As noted above, however, the cargo throughout the marine shipment was the property of the buyer, Caribe Steel.

After the Mar Tirreno cargo arrived at San Juan it was, following many days' delay, transported from the San Juan pier to the premises of the buyer, Caribe Steel. Both Caribe Steel and the seller, Thyssen Steel Caribbean, made a claim for damages against the vessel. Caribe Steel had not yet paid for the steel, so Thyssen Steel Caribbean, acting as a self-insured, gave Caribe Steel credit memos amounting to $94,068.58 in full settlement of Caribe Steel's claim, and then placed a claim with its own marine underwriter, Gradmann & Holler. Gradmann & Holler paid that claim to Thyssen Steel of Canada, Ltd., which then issued its check to Thyssen Steel Caribbean in settlement. The plaintiffs here claim

---

1. *See Mexican Produce Co. v. Sea-Land Service, Inc.*, 429 F.Supp. 552 (D.Puerto Rico 1974).

rights in subrogation based upon the foregoing chain of events.

We are firmly of the opinion that Thyssen Steel Caribbean had no actionable rights against these shipowners and operators, and thus could not transfer any rights in subrogation to its parent, Thyssen Steel of Canada, nor by the parent to these plaintiffs, the underwriters. The subrogee can have no greater rights than the subrogor. *See* 16 *Couch on Insurance 2d* § 61:109 and cases cited therein.

The testimony of Mr. Leon A. Bahr, the then Controller of Caribe Steel, supported by defendants' Exhibits V, W and X, proved very enlightening on this point. Mr. Bahr testified as follows:

> Upon receiving the credit memos referred to above from Thyssen Steel Caribbean, Inc., our file on the case was closed, and Caribe Steel and Tube Corporation did not, upon receiving the said credit memos, prior to that date, on that date, or any day thereafter, cede, transfer, convey, assign or transmit any of its rights on the shipment to any partnership, person, corporate entity or individual. This is what I meant when I said that our file on the claim had been closed.

The frantic efforts by Thyssen Steel Caribbean to dilute Mr. Bahr's clear statement of the facts, would only strengthen our finding that (1) title to the cargo at all relevant times was in the name of Caribe Steel, (2) Caribe Steel had been paid by Thyssen Steel Caribbean, and (3) Caribe Steel had not ceded subrogation rights to anybody. We find the testimony of Mr. Bahr on that issue to be credible and we were unimpressed by attempts to discredit or dilute it.

These cases should be dismissed on the issue of title.[2] However, on the off-chance that a reviewing court might decide that, in admiralty practice, a liberal application of the real party in interest rule under Rule 17(a) F.R.C.P., could be read to include a factual situation such as here presented, we now proceed to the issue of liability.

*The Issue of Whether the Bills of Lading Are Clean*

The bills of lading in question contain a printed clause on their back identified as Clause 26, "Iron, Steel and Any Other Metalurgical Products". Said clause, in its pertinent part, reads as follows:

> ... it is expressly agreed that superficial rust, oxidation, any like condition or any other slight alteration due to moisture, which might affect the external aspect of the goods is to be considered inherent to the special nature of the cargo. Acknowledgment of the receipt of the goods in apparent good order and condition is not a representation that such condition of rust, oxidation, and the like did not exist on receipt by carrier....

In turn, all the bills of lading are claused as follows:

> ... Contents unchecked, but said to contain indicated number of pieces and said to be of the indicated dimensions and weights. (Underlining ours.)

There was testimony in support, and the court finds that such a bill of lading is considered claused or unclean in the sense that the master of the vessel had no reasonable means to ascertain the condition of the cargo when received for loading on the vessel and the contents were unchecked. Where, as here, a plaintiff is confronted with a shipping documentation situation whereby his bill of lading contains exceptions, it then becomes his burden to prove that the goods were in good order and condition at the point of origin before shipment. These plaintiffs have wholly failed to meet that burden of proof by a preponderance of evidence on the issue of liability. Not being able to establish even a *prima facie* case of liability, no presumption of negligence arises and the burden of proving what happened during the maritime voyage does not shift to the shipowner or operator.[3]

2. *See Farbwerke Hoeschst A.G. v. M/V "Don Nicky"*, 589 F.2d 795 (5th Cir. 1979).

3. *Florencio Roman v. Puerto Rico Maritime Shipping*, 454 F.Supp. 521, 525 (D. Puerto Rico 1978).

*The Location of the Cargo on Board the Ship*

The complaint in the Mar Tirreno case alleged damages to 1,560 coils of galvanized wire covered by seven different bills of lading. Plaintiffs' original theory concerning the cause of the rust on that cargo was based on their allegations that sea water entered into the No. 2 starboard side, double bottom tank. However, the undisputed evidence at trial supported the defendants' position that these several cargos were transported in many different compartments in the vessel. In fact, some 90% of the 1,560 coils involved were stored in areas other than No. 2 starboard lower hold, where the leading sea water allegedly entered. Furthermore, other cargo in that No. 2 lower hold came through the voyage without damage. A drawing made during the trial and preserved as evidence, showing the arrangement of the cargo throughout the ship is attached to this Memorandum. This very fact alone serves to demolish plaintiffs' theory that sea water entering No. 2 starboard side lower hold could have been the cause of any damage to all that cargo scattered, as it was, over different sections and different levels of the ship.

ARRANGEMENT OF CARGO

207 coils
130 coils B/L
179 coils B/L

1 U T D

1 T D

1 L H

2 T D

493 B/ 17-18 30
245 Pieces
B/L 15-11-10-13-12-9-14
94 Tobes 60T
B/L 28 Pelluzo
16oT
66 pcs Toles B/L 27 46-42-34

4) MatecoInc B/L 41 galv.
3) B/ 42 Almaranes Antope galv
2) B/ 46 Niceveo Lumber galv
1) B/L 27 Carolina galv

3 T D

3 L H

4 T D

4 L H

634 Coils

B/L 29 B L33
B/ 32

80 coils B/L 33
144 coils B/L 31

5 T D
224 Coils

5 L H

Propeller

2 L H - 493 -
4 L H - 634 -
5 T D - 224

### The Delivery Cart Checks

The delivery cart checks—which were executed in connection with the unloading of the Mar Tirreno cargo—contained no reference to any observable damage other than those two which related to Bills of Lading # 29 and # 32. The former noted:

> 440 coils of galvanized wire and which were located in No. 4 lower hold; 27 coils loose and 19 coils stained;

and the latter (Bill of Lading No. 32):

> covered 257 coils of galvanized wire and which were located in No. 4 lower hold and No. 1 upper tween deck: 65 coils loose.

There was no evidence adduced by the plaintiffs to explain what was meant by "19 coils stained" in No. 4 lower hold. If, as the plaintiffs contend, the failure of the delivery cart checks to note any observable damages on the cargo was due to "sloppiness" on the part of the unloading stevedores, then it was encumbent upon the plaintiffs to subpoena those stevedores or those truckers who handled the cargo to establish that there was observable damage to the cargo. This they did not attempt to do. Additionally, it is noted here that other cart checks, covering other cargo not at issue here but arriving and unloaded from the same ship, did show exceptions of damages or apparent damage. Finally, Section 3(6) of the Act requires that:

> Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent, the notice must be given within three days of delivery . . . .

Neither of these requirements was complied with.

The case of the SS Madona is in general terms the case of the Mar Tirreno, as commented on above. The shipping order or dock receipt which preceded the issuance of the Bill of Lading that covered the Japanese shipment of galvanized wire contained the following exceptions:

> Unprotected cargo. Not responsible for bent, rusty, and bundles off. 20 coils cover slightly torn.

The bill of lading for the Madonna cargo contained the following printed language:

> The term apparent good order and condition when used in this bill of lading with reference to iron, steel or metal products does not mean that the goods, when received, were free of visible rust or moisture. If the Shipper so requests a substitute bill of lading will be issued omitting the above definition and setting forth any notations as to rust or moisture which may appear on the mate or tally clerk's receipts.

No such request was made by the shipper.

There are additional areas of evidence that support the conclusion that these plaintiffs in each case, assuming that they have standing to sue, have not met their burden of proving by a preponderance of the evidence, that these shipowners and/or operators were liable for any damage to these cargos. Indeed, they have not even established a *prima facie* case of liability.

Following six days of trial, including oral argument, followed by extensive briefing and memoranda, the court now makes and enters the following Findings of Fact and Conclusions of Law under Rule 52, F.R.C.P.

The foregoing Memorandum shall, to the extent applicable, constitute additional Findings of Fact and/or Conclusions of Law.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following constitute the court's findings of fact and corresponding conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.

1. On or about September 5, 1975, Caribe Steel and Tube Corporation (Caribe Steel), with address at "B" Street No. 20, Antonio Luchetti Industrial Park, in Cata-

no, Puerto Rico, placed a purchase order with Thyssen Steel Caribbean, Inc., for the purchase of 400 tons of galvanized wire with a total cost of $154,000.00. The terms of the sale were "C.I.F. San Juan, duty paid, excluding excise taxes". The price was payable net sixty days without interest. The purchase order states that delivery would be made from a shipment from Europe.

2. The aforementioned purchase order had been confirmed in advance by Thyssen Steel Caribbean, Inc., pursuant to its sale confirmation dated September 3, 1975.

3. An invoice covering the merchandise was issued by Thyssen Steel Caribbean, Inc., to Caribe Steel on October 21, 1975.

4. Thyssen Steel Caribbean, Inc., had bought the merchandise in question from a source in France.

5. The commodity in question was transported on the Motor Vessel MAR TIRRENO, which left the port of origin, Antwerp, Belgium, on the 9th of October, 1975, arriving in San Juan, Puerto Rico, on October 21, 1975. Gradmann & Holler's Marine Insurance Department in Hamburg issued a Certificate of Insurance No. 1–2690, dated October 20, 1975, under an open marine policy No. 7057, in the name of Thyssen Steel of Canada, Ltd. The Certificate of Insurance was issued one day before the ship arrived in San Juan, Puerto Rico. The Certificate in question insured the merchandise, any loss, if any, payable to the insured, Thyssen Steel of Canada, Ltd.

6. The commodity in question arrived from its source in France at the port of origin, Antwerp, Belgium, and was placed on board the Motor Vessel MAR TIRRENO, owned by Cia. Maritima del Nervion, a Spanish corporation, and time-chartered to Continental Lines/Contramar, S.A., a Belgian corporation, for its transportation to San Juan, Puerto Rico. Bills of Lading No. 17 and No. 18 were issued in Antwerp on October 9, 1975. The merchandise was consigned "unto order" and the notify party was Thyssen Steel Caribbean, Inc., with address in Hato Rey, Puerto Rico.

7. Since the sale of the merchandise between Thyssen Steel Caribbean, Inc., and Caribe Steel had been made "C.I.F. San Juan, duty paid, excluding excise taxes", on a date prior to the issuance of the bills of lading, the owner of the merchandise at the time of the issuance of Bills of Lading 17 and 18 was Caribe Steel and not Thyssen Steel Caribbean, Inc., and/or Thyssen Steel of Canada, Ltd. Knauth, *Ocean Bills of Lading*, 1953, pp. 339 to 353; *Mexican Produce Co. v. Sea-Land Service, Inc.*, 429 F.Supp. 552 (D.P.R.1974); *Ramfrez and Co., Inc. v. Gonzalez Clemente and Co.*, 46 P.R.R. 500 (1934); and *Smith v. Marano*, 267 Pa. 107, 110 A. 94 (1920).

8. Under the terms of the sale between Thyssen Steel Caribbean, Inc., and Caribe Steel, i. e., "C.I.F. San Juan, duty paid, excluding excise taxes", Thyssen Steel Caribbean, Inc., had the obligation of providing specific insurance for the benefit of Caribe Steel to cover the risks of marine transportation, which risks were for the account of Caribe Steel from the time of the sale which preceded the shipment and throughout the maritime journey up to the time of delivery in San Juan, Puerto Rico. Thyssen Steel Caribbean, Inc., did not procure independent specific insurance to cover the risks of marine transportation on behalf of its buyer, Caribe Steel. The testimony of Leon A. Bahr, Assistant Controller of Caribe Steel confirmed that this was the fact. The testimony of Mr. Charles Elias, Manager of Caribe Steel, further confirmed the fact that there was no insurance issued that he could account for on behalf of Caribe Steel.

9. The Motor Vessel MAR TIRRENO, with the shipment in question on board, arrived at the port of San Juan, Puerto Rico, on October 21, 1975, and the delivery of the merchandise covered by Bills of Lading 17 and 18 was made pursuant to Thyssen Steel Caribbean's Delivery Order No. 0067, dated October 20, 1975, to Caribe Steel. The fact that the merchandise in question covered by Bills of Lading 17 and 18 was delivered to its true and only owner, Caribe Steel, is further confirmed by the delivery receipts and/or cart checks which were issued by San Juan Mercantile Corpo-

ration, shipping agent for the defendants at the port of San Juan. The cart checks specifically show that the merchandise in question was delivered to Caribe Steel pursuant to the mentioned delivery order, which preceded in date the arrival of the vessel. After the arrival of the vessel there arose a dispute as to whether the shipment in question had arrived damaged.

10. The claim for damages of Caribe Steel, which was the sole and exclusive owner of the merchandise, was absorbed economically by Thyssen Steel Caribbean, Inc., who, in turn, placed a claim with its marine underwriters, Gradmann & Holler GmbH, under Certificate of Insurance 1–2690 referred to above. Gradmann & Holler GmbH paid Thyssen Steel of Canada, Ltd., for the claim in question. In turn, Thyssen Steel of Canada, Ltd., issued a check to Thyssen Steel Caribbean, Inc.

11. At all material times relative to the maritime transportation of the cargo, Caribe Steel was the owner of the goods; Thyssen Steel of Canada, Ltd., carried the insurance on its name only; Thyssen Steel Caribbean, Inc., paid Caribe Steel as if self-insured for the alleged damages; Thyssen Steel Caribbean, Inc., through Thyssen Steel of Canada, Ltd., placed a claim with its marine underwriters, Gradmann & Holler GmbH, and received payment thereof, and gave a subrogation receipt to Gradmann & Holler in exchange of payment.

12. Since Caribe Steel, the owner of the merchandise under the terms "C.I.F. San Juan, duty paid excluding excise taxes", was not insured under Certificate 1–2690, Thyssen Steel Caribbean, Inc., which was not the owner, could not give to Gradmann & Holler subrogation rights against the defendants by virtue of the payment which Thyssen Steel Caribbean, Inc., eventually received from Gradmann & Holler via the Canadian corporation, in settlement of the claim.

13. In light of the above, the complaint in Civil 78–664 (MAR TIRRENO) and that in the consolidated case 78–1403 which follows the same pattern, failed to state a claim upon which relief could be granted

insofar as Gradmann & Holler GmbH, et al., have any rights in subrogation against the defendants for the reason that such rights never existed insofar as Gradmann & Holler, et al., are concerned. In turn, the complaints failed to state a claim upon which relief could be granted on behalf of Thyssen Steel Caribbean, Inc., for the reason that Thyssen Steel Caribbean, Inc., was paid and satisfied economically by Gradmann & Holler, et al., and, further, had assigned whatever causes of action it had, whether valid or not, to Gradmann & Holler, et al., before the inception of these suits. In turn, the only party which could conceivably have at any time a cause of action for the damages suffered by the merchandise, if any, Caribe Steel, had been satisfied and its claim paid by Thyssen Steel Caribbean, Inc., all by way of credit memos. We note that in the MAR TIRRENO case, Caribe Steel is not a party. We have considered that in the SS MADONNA case, although Caribe Steel was made a party, no extension of time had been granted to said party to file said suit outside the limits of 46 U.S.C. § 1303(6).

14. Caribe Steel did not, upon receiving satisfaction from Thyssen Steel Caribbean, Inc., prior to the date of satisfaction, on the date of satisfaction, or on any date thereafter, cede, transfer, convey, assign, or transmit any of its rights on the shipment to any partnership, person, corporate entity, or individual.

15. If Gradmann & Holler, et al., elected to pay voluntarily to its insured, Thyssen Steel of Canada, Ltd., for the benefit of Thyssen Steel Caribbean, Inc., for the damages to a shipment which did not belong to Thyssen Steel Caribbean, Inc., all under Certificate of Insurance No. 1–2690, it was entitled to do so as a matter of grace or business practice, but not as a matter of law. No subrogation rights could have been preserved against the maritime carriers.

16. The above is the factual situation insofar as the issue of title is concerned since, as stated before, the merchandise which moved under Bills of Lading 17 and 18 belonged at all material times before the

bills of lading were issued to Caribe Steel under the conditions of sale, "C.I.F. San Juan".

17. The above factual situation repeated itself insofar as more merchandise of the same type arrived on the same vessel under the same conditions, at San Juan, Puerto Rico, on the same date. Said goods were covered by Bills of Lading 29, 30, 31, 32, and 33.

18. In all of the aforementioned shipments, the following characteristics are in common:

A. Thyssen Steel Caribbean, Inc., sold to Caribe Steel, pursuant to purchase orders and sales confirmations, galvanized wire "C.I.F. San Juan, duty paid excluding excise taxes".

B. The title over the merchandise passed at the port of origin on October 9, 1975, when the merchandise was loaded on board the M/V MAR TIRRENO, from Thyssen Steel Caribbean, Inc., to Caribe Steel, which then became the sole and exclusive owner of the merchandise.

C. Thyssen Steel Caribbean, Inc., which was not the owner of the merchandise, procured marine insurance for said merchandise through Thyssen Steel of Canada, Ltd., from Gradmann & Holler but did not procure specific insurance coverage for the true and only owner, Caribe Steel.

D. The merchandise in question was received at the pier in San Juan, Puerto Rico, by Caribe Steel as per delivery orders issued by Thyssen Steel Caribbean, Inc., to that effect.

E. The bills of lading showing Thyssen Steel Caribbean, Inc., as a party did not reflect the truth behind said documents, that is, that Caribe Steel was the true and only owner.

F. A claim for damages was placed in writing by Caribe Steel with San Juan Mercantile Corporation, agents for the ship MAR TIRRENO in San Juan. Although the goods were delivered from October 31 to November 6, 1975, the letter is dated November 21, 1975.

G. A claim was also placed by Thyssen Steel Caribbean, Inc., with San Juan Merchantile Corporation, as agents for the M/V MAR TIRRENO in San Juan, Puerto Rico, on October 30, 1975. If Thyssen Steel Caribbean, Inc., had knowledge as of October 30, 1975, before delivery to Caribe Steel had commenced, of alleged damages, there is no explanation for the fact that in the cart checks no exceptions were taken other than:

Bill of Lading 29: 27 coils loose, 19 coils stained;

Bill of Lading 32: 65 coils loose.

H. Since Caribe Steel was the true and only owner with rights over the merchandise allegedly damaged, and since under the "C.I.F. terms" Thyssen Steel Caribbean, Inc., had to procure and did not procure insurance naming Caribe Steel as an insured, Thyssen Steel Caribbean, Inc., gave Caribe Steel credit memos amounting to $94,068.58 in full settlement of Caribe Steel's claim against Thyssen Steel Caribbean, Inc.

I. In turn, Thyssen Steel of Canada, Ltd., collected from Gradmann & Holler under the certificates of insurance related above, which had been issued on its behalf, and reimbursed Thyssen Steel Caribbean, Inc., in the amount of $93,419.94.

J. Thyssen, whether Canada, Ltd., or Caribbean, Inc., gave subrogation rights to Gradmann & Holler against the steamship carrier for the alleged damages to the merchandise.

K. At the time of the filing of the present complaints, Thyssen Steel Caribbean, Inc., did not have a claim upon which relief could be granted in its favor since it had assigned by way of subrogation to Gradmann & Holler whatever rights it had, if any, against the defendants.

L. Gradmann & Holler, et al., who received the subrogation rights from Thyssen, irrespective of whether Canada, Ltd., or Caribbean, Inc., did not have at the time of the filing of the complaints a cause of action against the defendants, since the only person or entity who could

have given Gradmann & Holler subrogation rights was the true and only owner of the merchandise, Caribe Steel, and not Thyssen Steel Caribbean, Inc., and/or Thyssen Steel of Canada, Ltd. Gradmann & Holler paid under the certificates of insurance, properly speaking, without rights of subrogation.

19. The MADONNA case, No. 78–1403, insofar as the issue of title discussed above is concerned, follows the same pattern as the MAR TIRRENO action, No. 78–664.

20. The court received testimony at trial on how the affidavits in opposition to the Motion for Summary Judgment which appears on file were obtained. On the one hand, the affidavits in support were given voluntarily by the affiants, Mr. Leon Bahr, Assistant Controller, Caribe Steel; Mr. Angel Vizcarrondo, Controller, Caribe Steel; and Mr. Ruben Gorritz, Purchasing Agent, Caribe Steel. The testimony of Mr. Bahr revealed that the process of preparing said affidavits was a lengthy one and that every single item covered under oath was supported by Caribe Steel's files. In turn, the affidavits in opposition were prompted obviously by the realization on the part of plaintiffs that the issue of title would be dispositive of this case. Defendants' Exhibits V, W, and X are most revealing in relation to this aspect. Furthermore, as Mr. Bahr testified, the affidavits in opposition were simply supported by *an assurance received from Mr. Antonio Casola, Thyssen Steel Caribbean, Inc., and Mr. Charles Elias, Manager, Caribe Steel, as well as one of the attorneys for the plaintiffs, that there existed "other agreements" between Thyssen Steel Caribbean, Inc., and Caribe Steel which were unknown to the affiants. Said agreements are still unknown and remain secret, since the evidence presented by plaintiffs failed to uncover them. As the witness, Mr. Bahr, stated, he was led into signing the affidavit in opposition.* Rule 52(a) of the Federal Rules of Civil Procedure stands as authority for the fact that the court should make a determination on credibility as to this aspect. The defendants' evidence is definitely more credible than plaintiffs', and we so find.

21. Plaintiffs had the burden of proving to the court, in addition to the fact that they were the real party in interest, that there existed insurance coverage which would justify a payment under the policy of insurance, taking into consideration a given risk and a given insured party. Plaintiffs failed to meet that burden.

22. The plaintiffs failed to prove why the certificate of insurance, issued on October 20, 1975, that is, one day before the ship arrived in San Juan, when the goods had been on board the Vessel MAR TIRRENO since October 9, 1975.

23. Plaintiffs failed to prove by a preponderance of the evidence why, if according to their theory, Caribe Steel was the insured party, the two certificates of insurance were payable to the assured, Thyssen Steel of Canada, Ltd.

24. Plaintiffs failed to prove by a preponderance of the evidence that the certificates of insurance, described as negotiable by the testimony of Mr. Hans Camper, were ever negotiated to Caribe Steel. The evidence shows in this respect (testimony of Mr. Bahr and Mr. Elias), that the Caribe Steel file is devoid of any information pertaining to insurance coverage by Gradmann & Holler GmbH, et al.

25. The bills of lading in question contain a printed clause identified as Clause 26, "Iron, Steel and Any Other Metalurgical Products". Said clause, in its pertinent part, reads as follows:

> ... it is expressly agreed that superficial rust, oxidation, any like condition or any other slight alteration due to moisture, which might affect the external aspect of the goods is to be considered inherent to the special nature of the cargo. Acknowledgment of the receipt of the goods in apparent good order and condition is not a representation that such condition of rust, oxidation, and the like did not exist on receipt by carrier....

26. In turn, all the bills of lading are claused as follows:

... Contents unchecked, but said to contain indicated number of pieces and said to be of the indicated dimensions and weights.

27. The testimony received from plaintiffs' own surveyor, Mr. Vicente Gonzales Grau, was to the effect that such a bill of lading would be considered claused or unclean in the sense that the master had no reasonable means to ascertain the condition of the cargo and that the contents obviously would be unchecked. Said surveyor recognized that this type of clause was normal in the carriage of steel products. He further stated that if the shipper wished to avoid such a clause, he would then carry out a pre-shipment survey to certify to the shipowner the condition of the cargo at loading. The surveyor testified that this was standard practice in the industry.

28. In turn, Mr. Arthur Sparks testified that in Antwerp, where this shipment originated, this type of clause is to be considered usual. He further testified that it is impossible, due to the volume of stevedoring work carried out in said port, for the master to check coils of wire one by one, especially when they are bundled, as in this case. Therefore, it was the expert opinion of Mr. Sparks that the bills of lading were unclean and/or claused.

29. Plaintiffs presented a set of 67 cart checks pertaining to the unloading of the SS MAR TIRRENO. An examination of these cart checks will show that they contain, with respect to Bills of Lading 17, 18, 29, 30, 31, 32, and 33, (those here in question), the following exceptions:

A. Bill of Lading 29, which covered 440 coils of galvanized wire and which was located in No. 4 lower hold: 27 coils loose and 19 coils stained.

B. Bill of Lading 32, which covered 257 coils of galvanized wire and which was located in No. 4 lower hold and No. 1 upper tween deck: 65 coils loose.

30. Plaintiffs, who had the burden of proof in this case, failed to prove to the court the meaning of "19 coils stained". As stated by the witnesses, stains could be anything ranging from dirt to grease marks, to superficial rust, i. e., practically anything.

31. Although there was no evidence on the part of plaintiffs pertaining to cart check content, they have argued and implied that the cart checks were improperly filled out and that many mistakes were committed in the preparation of said documents. An examination of these cart checks will show that they were accurately filled out:

A. All the cart checks contain the date of delivery.

B. All the cart checks contain the name of the vessel.

C. All the cart checks contain the voyage number.

D. All the cart checks contain the bill of lading number.

E. All the cart checks contain the marks as they appeared from the merchandise, the number of lifts or pieces covered by the cart check, and the name of the consignee. If the buyer happened to be the same as the consignee, the word "same" would be inserted.

F. All the cart checks contain a truckman's signature, a truck number identification plate, and the signature of the checking clerk.

G. In the section "Remarks", where items of damage would be noted, we will see from Plaintiffs' Exhibit 3–b, set of 67 cart checks, including the ones pertinent at bar and others, that the persons who prepared these documents took the time to write on them exceptions of damage. No irregularity can be charged in this particular instance to the Puerto Rico stevedores, since the documents speak for themselves.

32. The following cart checks (also relating to the MAR TIRRENO although not involved in the case at bar) but in evidence as Plaintiffs' Exhibit 3-B, show that these documents, among many others, were handled properly:

A. Cart Check D 15518, B/L 4. Contains exceptions to the effect that the contents in different lifts contained 20 bars and 26 bars *bent*, respectively.

B. Cart Check D 15505, B/L 7. Contains an exception: two cases numbered 1 and 4 found *rattling*, content unknown.

C. Cart Check D 15496, B/L 7 is in the *same condition as the one described before*.

33. As noted above, the MAR TIRRENO complaint is a claim for damages to 1,560 coils of galvanized wire covered by bills of Lading 17, 18, 29, 30, 31, 32 and 33. Mr. Arthur Sparks testified to the court that an examination of the ship's documentation, to wit, cargo plan, hatch list, bills of lading with their appropriate references, and the surveyors' reports, show that the cargo covered by Bills of Lading 17, 18, 29, 30, 31, 32 and 33, i. e., 1,560 coils, were stowed in the following compartments. (This was confirmed by Dr. Watt's testimony, in his capacity as scientific investigator):

A. No. 1 upper tween deck contained part of the shipment covered by Bill of Lading 32, i. e., 130 coils. The balance was contained in No. 4 lower hold as will be seen hereinafter.

B. No. 1 upper tween deck also contained part of the coils covered by Bill of Lading 30 insofar as the balance was contained in No. 2 lower hold as will be seen hereinafter.

Therefore, No. 1 upper tween deck contained 130 coils covered partially by Bill of Lading 32, and 79 coils covered partially by Bill of Lading 30.

C. No. 2 lower hold contained 223 coils covered by Bill of Lading 18; 219 coils covered by Bill of Lading 17, and 51 coils partially covered by Bill of Lading 30. The balance of the coils covered by said Bill of Lading were in No. 1 upper tween deck.

D. No. 4 lower hold also contained part of plaintiffs' cargo: 127 coils covered by Bill of Lading 32 were in No. 4 lower hold. The balance covered by said Bill of Lading was in No. 1 tween deck. Also, 440 coils covered by Bill of Lading 29 were contained in No. 4 lower hold. In addition, 67 coils partially covered by Bill of Lading 33 were there contained. The balance of Bill of Lading 33 happened to be in No. 5 tween deck.

E. No. 5 tween deck contained 80 coils covered by Bill of Lading 33 and 144 coils covered by Bill of Lading 31.

■ As will be shown, plaintiffs' theory that flooding occurred in the No. 2 lower hold causing damages has no meaning in light of the arrangement of this cargo throughout the ship. Plaintiffs claim in the Complaint that damages occurred to all Bills of Lading, i. e., 17, 18, 29, 30, 31, 32 and 33, covering 1,560 coils, when the goods were transported in different compartments of the vessel, carries an inherent inconsistency which plaintiffs cannot explain and which goes to the essence of plaintiffs' right to recover in this case.

The stowage of the cargo as described above presents the plaintiffs with many unanswered questions:

A. There is no evidence on how 130 coils covered by Bill of Lading 32, or part thereof, located in No. 1 upper tween deck, could get damaged, when part of said cargo was also located in No. 4 lower hold where, according to Mr. Catanzaro, there was some damage.

B. There is no evidence before this court which will establish damages to 79 coils covered by Bill of Lading 30, located in No. 1 upper tween deck, when part of said coils covered by the same Bill of Lading were located in No. 2 lower hold, which was the

place where everybody on plaintiffs' side suspected damages.

C. There is no evidence as to how coils covered by Bills of Lading 29 and 32, located in No. 4 lower hold, became damaged.

D. There is no evidence of how 80 coils partially covered by Bill of Lading 33, located in No. 5 tween deck, could be damaged when the balance was located in No. 4 lower hold.

E. There is no evidence of how 144 coils covered by Bill of Lading 31 could be damaged in No. 5 tween deck.

F. There is no evidence which plaintiffs could rely on to establish which coils covered by Bill of Lading 30 were located in No. 2 lower hold and which were located in No. 1 upper tween deck.

G. There is no evidence which will assist this court in determining which of the coils covered by Bill of Lading 32, whether those located in the No. 1 upper tween deck or the ones located in No. 4 lower hold, were damaged, if at all.

H. There is no evidence which will assist this court in determining whether the coils covered by Bill of Lading 33 contained in No. 4 lower hold and No. 5 tween deck are identifiable one way or the other as being damaged.

34. As to No. 2 lower hold, the evidence is clear from Captain Luis Solis Lluch's deposition that on his way from Antwerp to San Juan, the No. 2 double bottom ballast tank, starboard side, began to take water involuntarily and that the matter had to be corrected by ballasting the opposite tank by pumping. The main concern was the stability of the ship and not the flooding of the hold, since the tank is a separate compartment.

35. Upon the ship's arrival in San Juan, Captain Solis Lluch immediately contacted Lloyd's Agency, with whom the MAR TIRRENO had been entered with the highest classification. Surveyor Francis B. Crocco, a qualified hull surveyor, attended the ship and with the assistance of diver Alberto

Umpierre repaired the condition to the point in which the ship retained its classification until 1976 for further repairs to be carried out in Spain.

36. Captain Crocco's findings are significant. The court finds that had he seen anything wrong in the ship in the area of No. 2 lower hold or anything wrong in the No. 2 ballast tank, starboard, including its piping, and obviously if flooding had occurred, he would have stated so in his report. Be it remembered that when Captain Crocco was called to testify by the defendants, his testimony was stipulated to be that he had intervened with the MAR TIRRENO, that he was in charge of the repair insofar as Lloyd's Register of Shipping is concerned, that the repair was limited to No. 2 ballast tank starboard, side, that there were no other matters which needed attention at the time, and that, to his recollection, hold No. 2 was dry.

37. In addition, the Captain decided that it would be proper to have the ship's log examined by Captain Crocco, who in turn made a notation therein. At Page 146 of the ship's log book, it is stated in the English language, handwritten by Captain Crocco, as follows:

It was noted by the vessel on the 17th of October 1975 while en route from Antwerp to San Juan, P.R., that sea water was entering the No. 2 Ballast Tank Starboard Side. Upon arrival at San Juan P.R., divers inspected the shell plating and found a hole in the shell plate between frames 128–129. As a temporary measure, the hole was plugged and a cement box was fitted between frames 128–129 and the 2nd & 3rd longitudinal. The work was done in a satisfactory manner and in my opinion the vessel may proceed on her voyage and retain the Class with Lloyd's Register of Shipping. Vessel to be further inspected upon arrival in Spain and dealt with as found necessary. F. B. Crocco, Surveyor L R of S. No mention of hold flooding is made in said note.

38. All the surveyors agreed that a punctured double bottom ballast tank, in

the circumstances of this particular case, when the regular drydocking had been completed, this having occurred between drydockings, and the ship being in the highest Lloyd's classification, did not constitute unseaworthiness before or at the beginning of the voyage. What happened could not even be labeled improper maintenance. It was deterioration of the ship's plating at that particular point. There is no evidence by plaintiffs to the effect that water came into No. 2 lower hold. In closing argument, plaintiffs so admitted, stating that at that stage they would change their theory to be that the water came from the top, i. e., through the hatch covers. Therefore, it has to be concluded that nothing happened to the hold. The problem was contained in the No. 2 double bottom starboard ballast tank which was punctured and admitted involuntary ballasting. The tank, a completely independent compartment from the hold, was temporarily repaired in San Juan. Final repairs were subsequently carried out in Barcelona, Spain, in 1976.

39. The next page shows hold No. 2 with its contents in the order in which they were loaded. Thus, it can be assumed that the goods covered by Bill of Lading 27 were at the bottom of the hold and that the goods represented by Bills of Lading 17, 18, and 30, were located in the upper part of No. 2 lower hold. At trial, a diagram of all cargo holds was made on the court's blackboard and used by all parties. The diagram which we are incorporating into these findings corresponds to hold No. 2 as shown in the court's blackboard at trial.

40. According to the testimony of Mr. Arthur Sparks, had there been a partial flooding of No. 2 lower hold, the damage to the goods there contained, Items 1 to 7, equivalent to hundreds of tons of cargo, would have been substantial. Mr. Sparks testified that condensation would have occurred, especially when the ship sailed from a cold to a warm climate and that, in his opinion, the damage would have been one hundred per cent to all the cargo. In addition, we find the following logical inconsistencies in plaintiffs' claim:

## NUMBER 2 LOWER HOLD AND TWEEN DECK

### NO. 2 TWEEN DECK

Weather Deck Hatch Cover

Tween Deck Hatch Cover

94 Toles --- (5)

66 Pcs. Toles ---

AFT

(7) B/L 17, 18, 30 Thyssen Steel Caribbean, Inc. (Caribe Steel) 493 coils of unwrapped galvanized wire - 497,144 Kos.

(6) B/L 9, 10, 11, 12, 13, 14, 15, Thyssen Steel Caribbean, Inc. - 245 coils Sendzimir Galvanized Coils - 1,057,740 Kos.

(5) B/L 28 Pelluzzo Iron Works - 94 pieces of Hot Rolled Steel Plates - 60,180 Kos. (Plaintiffs brought evidence of claim).

(4) B/L 41 Mateco, Inc. - 6 lifts of Galvanized Corrugated Sheets-12,587 Kos. (Plaintiffs brought evidence of claim).

(3) B/L 42 Almacenes Arilope Inc.-10 lifts of Galvanized Corrugated Sheets-24,079 Kos.

(2) B/L 46 Nieves Lumber Corp.-100 rolls Galvanized Wire Mesh - 2,020 Kos.

(1) B/L 27 Carolina Steel Corp. - 38 lifts of Galvanized Steel Sheets-110,506 Kos. (Plaintiffs brought evidence of claim).

FORWARD

A. No damage was reported under Bill of Lading 46, located at the bottom of No. 2 lower hold on 100 rolls of galvanized wire mesh, consigned to Nieves Lumber Corporation.

B. No damage was reported under Bill of Lading 42, consigned to Almacenes Arilope, Inc., on 10 lifts of galvanized corrugated sheets with a weight of 24,079 Kos., located in No. 2 lower hold.

C. No damage was reported by Thyssen Steel Caribbean, Inc. under Bills of Lading 9, 10, 11, 12, 13, 14 and 15, which represented a substantial portion of the shipment contained in No. 2 lower hold, i. e., 245 coils of Sendzimir galvanized wire with a weight of 1,057,740 Kos.

41. We find that there was no flooding in No. 2 lower hold. Flooding would not have been selective in the process of damaging one cargo and not the other. This inconsistency was not explained by plaintiffs, who had the burden of proof.

42. There is no explanation as to how water coming into the ballast tank could damage goods under Bills of Lading 17, 18 and 30, which were the Thyssen Steel Caribbean, Inc., (Caribe Steel), coils—the object of this suit—when they were located in the upper part of No. 2 lower hold. If water would have reached the upper lower hold from below, it would have damaged everything in its path.

43. In closing argument, plaintiffs were forced to abandon for a while their theory that sea water necessarily came from below. They then changed to the theory that water came through the weather deck hatch cover of No. 2 tween deck and hold. But if such were the case, there is no evidence of damage to the merchandise located in No. 2 tween deck. Said merchandise would have been affected primarily by water coming into the cargo space through the weather deck hatch cover. There still would be an inconsistency as to how the water dripped from above and damaged so selectively certain items and not others.

44. We find from the testimony of Mr. Marcel Gaston Pierroz, former Manager of Caribe Steel, that the galvanized wire which is the object of the MAR TIRRENO suit was brought from only one source in France; that Caribe Steel had not previously bought French steel from this producer; that the quality of the French steel was not equivalent to German steel which they formerly purchased; and that, under the circumstances, they would have never bought more material from the same source.

45. Plaintiffs claimed as their only way to support a theory to the effect that all the damaged cargo was contained in No. 2 lower hold exclusive of all other cargo spaces, that a mix-up had occurred in Antwerp. The claim is basically that Bills of Lading 17 and 18 show that they were "mixed on quay" before shipment. From there, plaintiffs have requested this court to project and state that if this mix-up existed in Antwerp, possibly plaintiffs' own surveyors, Messrs. Pasquale Catanzaro and William Munch, Inc., were also mixed up in determining that the cargo was contained in more than one cargo hold. Plaintiffs' own evidence contradicts the above. The court finds that there is and was no such mix-up.

46. The testimony of two chemists was received by the court and the findings to be made as a result of said testimony can only be that Mr. Vilella's (for the plaintiffs) determination of sea water contamination was improperly carried out. In this respect, we find that Dr. Watt's testimony is more in line with the portions of the text read into the record with the court's permission from the Lloyd's Survey Handbook, 1973 edition, Lloyd's Press, London, England.

47. We find, in light of Dr. Robert Watt's testimony presented on behalf of the defendants, that chemist Vilella, with the evidence he had, could not infer anything. His results were meaningless in scientific terms. We accept Dr. Watt's explanation for the damages as they appeared at Caribe Steel more than one month after delivery and at the time of survey. The coils remained on the outside premises of Caribe Steel from delivery until after the surveys were conducted, commencing on November 20, 1975, and extending until the month of

December, 1975. Rain water seems to be the most probable cause, occurring at Caribe Steel's premises.

48. Plaintiffs failed to prove by a preponderance of the evidence that the chemical cause of damage was sea water contamination.

49. We further find that:

A. The surveys failed in their purpose to establish the cause of loss or damage and to assess fairly the degree thereof.

B. To a large extent, the successful achievement of the surveys depended upon the experience and efficiency of the persons who undertook the work of surveying. In this case, the damage was of such a nature that the surveyor needed to have an understanding of the special characteristics or properties of the goods with which they were called upon to deal, and to be familiar with the treatment which could be necessary to minimize the loss. The evidence shows that the surveys were not successful precisely because the surveyors admitted to the court their lack of knowledge on galvanized commodities and their lack of knowledge of the special characteristics or properties of the goods which they were called upon to deal with. Obviously, they were unfamiliar with any treatment that could be deemed necessary to minimize the loss.

50. Plaintiffs, having failed to establish their burden of proof, cannot claim damages, especially when the defendant carriers did present evidence to establish the cause of the loss for which they would not be liable, pointing to faults in the goods and cargo interest. *Florencio Roman, Inc. v. Puerto Rico Maritime Shipping Authority*, 454 F.Supp. 521 (D.P.R.1978).

51. In relation to the consolidated case 78–1403, M/V MADONNA, an examination of plaintiffs' Exhibits 4 and 13, in light of the testimony of surveyor Hernan Pietri, shows that the shipping order or dock receipt which preceded the issuance of the bill of lading that covered the movement of galvanized wire from Osaka, Japan, to San Juan, Puerto Rico, contains exceptions making it an unclean bill of lading. The exceptions are as follows:

Unprotected cargo. Not responsible for bent, rusty, and bundles off. 20 coils cover slightly torn.

52. An examination of plaintiffs' Exhibits 4 and 13, in light of the testimony of surveyor Hernan Pietri, also shows, in relation to said consolidated case 78–1403, that of the 54 coils allegedly damaged by sea water contamination, plaintiffs' evidence does not show whether any of those coils belong to the 20 coils which had been excepted in the dock receipt.

53. There is a discrepancy as to the date of the arrival of the M/V MADONNA. On the one hand, the Certificate of Survey T–326/3734 states that the ship arrived at San Juan in June of 1976. On the other hand, the evidence received from the surveyor was to the effect that this was a mistake and that the ship had arrived on July 13, 1976. Although the goods were allegedly delivered as per certificate of survey on July 28 and 29, 1976, no survey was carried out until August 5, 1976.

54. As it happened in the MAR TIRRENO case, the cart checks issued to cover the delivery of this particular wire carried no exceptions of damage at port of destination. The survey report so confirms.

55. The surveyor Hernan Pietri could not conclude on his own what was the cause of damage and, as happened in the MAR TIRRENO case, relied on chemist Mario Q. Vilella for an answer. The answer was salt water contamination. Said conclusion is as deficient and as unacceptable as the similar conclusion given by the same chemist in the MAR TIRRENO case.

56. Although the M/V MADONNA left the port of origin on June 13, 1976, the certificate of insurance issued by Gradmann & Holler's Hamburg agency against open marine policy 7057 in the name of Thyssen Steel of Canada, Ltd., was not issued until July 2, 1976.

57. Otherwise, the M/V MADONNA claim is similar in nature to the MAR TIRRENO claim.[1]

### CONCLUSIONS OF LAW

On the basis of the above findings of fact, the court makes the following conclusions of law:

In relation to Findings of Fact 1 through 24, inclusive, we conclude as a matter of law as follows:

■ 1. It has been held by the Supreme Court of Puerto Rico, by this court, and also by leading authorities in state courts, that when a purchase is made under a C.I.F. contract, the seller must, among other things, provide and pay for marine insurance on behalf of the buyer and obtain bills of lading on behalf of the buyer. In turn, under the C.I.F. quotation, the buyer must receive the goods upon arrival, handle and pay for all subsequent duties and taxes, and be responsible for loss or damage to the goods, or both, from the time and place at which the seller's obligations cease. In this case, the obligations of the seller ceased when an allegedly clean bill of lading was obtained. *Mexican Produce Co. v. Sea-Land Service, Inc.*, 429 F.Supp. 552 (D.P.R. 1974). This court finds authority to so decide in *Ramfrez & Co., Inc. v. Gonzales Clemente & Co.*, 46 P.R.R. 500 (1934) and in the leading case of *Smith v. Marano*, 267 Pa. 107, 110 A. 94 (1920). Authority is also found in Knauth, *Ocean Bills of Lading*, 1953, pp. 339 to 353.

2. The factual situation as found in relation to the issue of title cannot be controverted or denied. The documents speak for themselves. Thyssen Steel Caribbean, Inc., bought some merchandise in France, sold it immediately to Caribe Steel, and the terms and conditions of the sale were "C.I.F. San Juan". Thyssen Steel Caribbean, Inc., transferred title to Caribe Steel when it obtained an allegedly clean bill of lading to the named point of destination. To supply the deficiency of not having obtained insurance on behalf of Caribe Steel, Thyssen Steel Caribbean, Inc., gave Caribe Steel two credit memos in the amount of the alleged loss. After doing that, Thyssen Steel Caribbean, Inc., went to Gradmann & Holler and collected under the marine insurance certificate as if it were the owner of the merchandise. We note that from the bills of lading without more, there existed a *prima facie* showing that Thyssen Steel Caribbean, Inc., was the owner and the eventual consignee. Gradmann & Holler, who had insured Thyssen Steel Caribbean, Inc., found Thyssen's claim "in order" and paid the same to Thyssen Steel of Canada, Ltd., who in turn reimbursed Thyssen Steel Caribbean, Inc. Thereafter, Thyssen Steel Caribbean, Inc., or the Canadian corporation, gave subrogation receipts to Gradmann & Holler. Of course, Gradmann & Holler could not sue further in subrogation because the entity that had given Gradmann & Holler rights in subrogation was not the owner and, thus, could not assign rights of any kind to anybody.

3. The net result of this whole operation was that Caribe Steel, the true owner of the merchandise, received compensation for the alleged loss; that Thyssen Steel Caribbean, Inc., received reimbursement from its own insurance for the loss it had to bear before Caribe Steel; and that Gradmann & Holler, who was the ultimate payee, ended up without subrogation rights of any kind because of the fact that its insured had no rights over the merchandise since the moment it was placed on board the M/V MAR TIRRENO in Belgium for the maritime journey to San Juan. If Gradmann & Holler, as an underwriter, paid a party who was insured (Thyssen), but who was not the owner of the merchandise, that is fine and acceptable. Of course, this court cannot accept under the case law, that Gradmann & Holler would receive subrogation rights through that payment when the true owner was not involved at all and there had been no cession or subrogation between Caribe Steel and Thyssen Steel Caribbean, Inc.

1. There is no evidence that the charterer of the M/V MADONNA is responsible for this loss. As noted in the accompanying Memorandum, the owner of said ship was not impleaded.

Thyssen Steel Caribbean, Inc., of course, cannot even appear in the caption of the complaints for reasons outlined above.

4. Furthermore, since an assignee by definition stands in the same position as the assignor, it necessarily follows that the insurer cannot recover from a third person by virtue of an assignment when its assignor could not have done so. That is to say, an insurer which has taken an assignment of the insured's rights against a wrongdoer cannot recover thereon in the absence of proof of actionable wrong. In this respect, the assignment has the same effect as rights arising by way of subrogation, for here also the subrogee has no greater rights than those, if any, of his subrogor. See 16 *Couch on Insurance* 2d § 61:109, and cases cited therein. Dismissal is warranted on the issue of title.[1]

5. Furthermore, in relation to Findings of Fact 21 through 29, inclusive, we conclude that plaintiffs failed to prove proper insurance by a preponderance of the evidence. Plaintiffs proposed an issue or set of issues, and had the burden imposed by law of proving the facts and the issues by the means established in the Rule of Evidence, by a preponderance of the evidence. The quality of plaintiffs' evidence did not outweigh in power, influence and importance all the other evidence received by the court.

In relation to Findings of Fact 30 through 40, inclusive, we conclude as a matter of law as follows:

6. When a plaintiff is confronted with a shipping documentation situation whereby his bill of lading contains exceptions, the burden of proof is upon him to show that the goods were in good order and condition at the port of origin before shipment. This has not been done in this case. Therefore, the plaintiff cannot even establish a *prima facie* case which would allow him to recover any damages. *See Jose B. Gutierrez v. Sea-Land Service, Inc.*, (D.P.R. 1979), pp. 4 *et seq. See also Florencio Roman, Inc. v.*

*Puerto Rico Maritime Shipping Authority,* 454 F.Supp. 521 (D.P.R. 1978).

7. Furthermore, there is case law to the effect that in a shipment of galvanized commodities, when a bill of lading contains a notation to the effect that the weight, quality, quantity, and contents are unknown, and the master had no reasonable means of effecting control, said bills of lading are not to be considered clean. The plaintiff is not to rely on them as acknowledging actual good order and condition at the time of receipt by the ocean carrier. *Star Cooler Corporation v. P. Meyer/Meyer Line and the New York Central Railroad Company,* 1965 A.M.C. 2237.

8. *Star Cooler Corporation, supra,* contains a Finding of Fact No. 27 which reads as follows:

27. Ocean bills of lading issued with respect to the two parcels of packages on HAVORN and the parcel of packages on HAVMANN acknowledged receipt from the shipper of 'the goods or packages said to contain goods hereinafter mentioned, in apparent good order and condition,' and bore the notation, 'Weight, quality and quantity of contents unknown. Shipper acknowledging that master had no reasonable means of effecting control.'

9. In addition, said decision contains a Finding of Fact No. 39 which reads as follows:

39. A sheet-by-sheet examination of the contents of all the packages from the HAVORN and HAVMANN shipments disclosed that every sheet, without exception, was contaminated with a white or gray-rust deposit, stained, and wet to the touch.

The evidence before the court in the present case did not even amount to that.

10. Said decision contains Conclusions of Law 4 and 6 which read as follows:

4. Plaintiff has the burden, if it would show entitlement to recovery from the ocean-carrier defendants, or any of them,

---

1. *Prevor-Mayorsohn Caribbean, Inc. v. P. R. Mar. Mgt., Inc.*, 620 F.2d 1, April 11, 1980 (1st Cir. No. 78–1359) is factually distinguishable from the case at bar. The same does not alter our findings and conclusion on the issue of title.

of proving that the galvanized steel sheets were in actual, not merely apparent, good order and condition when the shipments were tendered to the motorships HAVORN and HAVMANN at Rotterdam in February and March, 1960, after defendant proved that the white rust contamination was the result of an inherent vice. (Citations omitted.)

6. Plaintiff has failed to establish that the galvanized steel sheets were in actual good order and condition when the packages containing them were delivered to the ocean carrier at Rotterdam or to the railroad carrier in Brooklyn.

11. Dr. Watt's testimony explained and proved on behalf of the defendants that the white rust contamination was a result of vice inherent to the galvanizing process as seen in these particular rolls through the photographs. Therefore, the defendants in these cases are entitled to rely on Conclusion of Law No. 7 of *Star Cooler, supra,* which reads as follows:

7. The ocean bills of lading were not clean bills and were not in such form as to entitle plaintiff to rely upon them as acknowledgments of receipt of the shipments by the ocean carrier in actual good order and condition. (Citations omitted.)

Based on this point, dismissal is warranted.

12. Related to the cart checks and to the issue of burden of proof, we mention the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.,* § 3(6) of the Act, 46 U.S.C. § 1303(6), which states in its pertinent part as follows:

Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent, the notice must be given within three days of delivery....

■ Under said section of COGSA, plaintiffs had the obligation in law to report obvious damage in writing to the carrier by stating the loss or damage and the general nature of said loss before or at the time of the removal of the goods. Failure to do so would convert such removal into a *prima facie* evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage was not apparent, the notice had to be given within three days (72 hours) of delivery.

13. If all the cart checks appeared to be prepared in the ordinary course of business, this court would have to assume too many mistakes and would be relieving plaintiffs of their burden of proof as to why the cart checks were not handled properly on plaintiffs' behalf. The only logical conclusion that can be made is that in the cargo in question now before this court for adjudication, the merchandise covered by Bills of Lading 17 and 18 was delivered clean and undamaged; the goods covered by Bill of Lading 29 were delivered 27 coils loose and 19 coils stained, without the court having been placed in a position to determine what the stains were; Bill of Lading 32 was delivered with 69 coils loose; and Bill of Lading 33 was delivered clean. The same would apply to Bills of Lading 30 and 31.

14. As stated by *The Aggersborg, Otis, McAllister Export Corporation v. Grandcolombiana (New York), Inc., Flota Mercante Grancolombiana, S.A., and M/S AGGERSBORG,* 1963 A.M.C. 1114, if no inspection or notation of damage was made at out-turn from vessel, especially when almost a month elapsed before the surveys were carried out, the cart checks are indicative of the fact that the damage is not of the responsibility of the shipowner. Quoting from said case at p. 1115

... However, libellant has failed to establish that the cargo was in a damaged condition when discharged from the M/S AGGERSBORG, proof of which is essential to establish a case of *prima facie* liability.[2] This burden of proof is met 'only when the condition of the goods on outturn is utterly inconsistent with the represented apparent good condition at the time of loading.'[3] The bundles were not inspected and their condition was unknown at outturn. The rust damage was

not noticed until approximately a month subsequent to the carrier's discharge of the goods. Libellant's failure to give notice of damage at the port of discharge before or at the time of the removal of the goods, creates *prima facie* evidence of the delivery by the carrier of the cargo in good condition,[4] which presumption was not adequately rebutted by libellant. (Footnotes omitted.)

15. On the issue of the cart checks, the plaintiffs have failed to prove their case by a preponderance of the evidence which, as the defendants have stated, should be dismissed.

16. In relation to Findings of Fact 41 through 57, we conclude that plaintiffs failed to prove the particulars covered in said findings by a preponderance of the evidence. The evidence presented by plaintiffs did not outweigh, or at any time become superior in weight, power, and convincing influence, in light of all other evidence presented by the defendants and the evidence seen as a whole, all under the applicable case law. *Florencio Roman, Inc. v. Puerto Rico Maritime Shipping Authority*, 454 F.Supp. 521 (D.P.R. 1978).

17. The claim in the M/V MADONNA case followed a similar pattern to that of the M/V TIRRENO and warrants dismissal on the same grounds.